# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HILL DERMACEUTICALS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07-cv-00552 (RCL) |
| ) | |
| U.S. FOOD & DRUG ) | |
| ADMINISTRATION, et al., ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO STAY

## INTRODUCTION

On March 16, 2007, plaintiff, Hill Dermaceuticals, Inc. ("HDI"), filed suit against the

United States Food and Drug Administration ("FDA") and Andrew C. von Eschenbach, M.D.,

the Commissioner of Food and Drugs, seeking "declaratory, injunctive, and mandamus relief."

Compl. ¶ 1.  HDI alleges that FDA has violated the Administrative Procedure Act, 5 U.S.C.

§§ 555(b), 706(1) ("APA"), by delaying unreasonably in responding to a citizen petition that HDI

submitted to FDA concerning generic[1] versions of HDI's innovator drug Derma-Smoothe/FS®

(fluocinolone acetonide topical oil, 0.01%) (hereafter, "Derma-Smoothe").  *See id.* ¶¶ 1, 3, 25.  In

the petition, HDI requests, *inter alia*, that FDA permit applicants for generic versions of Derma-

Smoothe to establish that their drug products are bioequivalent to Derma-Smoothe "only be done

by conducting studies with clinical endpoints," Compl. Ex. B. at 1, the effect of which would be

---

[1]The term "generic" is not defined in the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.
§§ 301-97 or FDA regulations.  It is used here to refer to drug products for which approval is
sought under an abbreviated new drug application ("ANDA").  ANDAs are discussed *infra* at 4-
5.

to make it more difficult, expensive, and time-consuming for generic competitors to establish bioequivalence.  Although HDI submitted its citizen petition on September 30, 2004, it has since amended and/or supplemented it several times, most recently on in March 2007.  On April 13, 2007, HDI moved this Court for an order preventing FDA from approving any generic version of Derma-Smoothe until FDA "provides a substantive response to [HDI's] Citizen Petition."  Pl.'s Proposed Order Granting Stay at 2.

To prevail on its motion to stay, HDI must show, *inter alia*, that it has a substantial likelihood of success on the merits and that it will suffer irreparable injury in the absence of the stay.  HDI's motion fails on both accounts.  Neither the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-97 ("FDCA"), nor FDA regulations require FDA to respond to HDI's citizen petition at or before the time it approves a generic competitor to Derma-Smoothe.  Moreover, consistent with agency regulations that require FDA to approve a citizen petition, deny it, or "[p]rovide a tentative response" within 180 days of receiving the petition, *see* 21 C.F.R. § 10.30(e)(2), by letter dated March 24, 2005, FDA explained to HDI that the agency had not yet reached a decision on the petition "because of the need to address other Agency priorities" and that the agency "will respond to your petition as soon as possible given the numerous demands on the Agency's resources."  *See* Compl. Ex. C.  HDI's contention that FDA's tentative response letter does not satisfy 21 C.F.R. § 10.30(e)(2)'s requirement is contrary to the regulation's plain language.  In addition, under the circumstances present in this case, HDI cannot show that the delay in responding to the petition, which HDI supplemented within the last two months, warrants, in the plaintiff's own words, "extraordinary relief."  *See* Pl.'s Mem. in Supp. of Motion to Stay at 2 ("Pl.'s Mem.").

2

HDI has similarly failed to show that FDA's delay in responding to the petition is causing HDI any current harm, much less concrete irreparable harm. The petition does not affect HDI's ability to market Derma-Smoothe, which the company is currently marketing pursuant to its approved new drug application, and FDA has not approved any generic competitor to Derma-Smoothe. HDI has thus failed to demonstrate that it is presently suffering any harm that would be redressed by the extraordinary relief it requests. Moreover, HDI's assertion that if FDA does not substantively respond to HDI's petition before reaching a decision on whether to approve an application for a generic competitor, (1) FDA may approve a generic competitor that is not, in fact, bioequivalent to Derma-Smoothe, (2) that the imagined bio*in*equivalent generic drug will injure the public health, and (3) that the hypothetical injury *caused by the competitor* will harm *HDI's* reputation and goodwill, is unsupported and wildly speculative. FDA only approves generic drugs if and when the statutory and regulatory requirements for safety and effectiveness – including bioequivalence – have been satisfied. Because HDI has not shown that it is likely to succeed on the merits of this case or that it will be irreparably harmed without a stay, its motion should be denied.

Although FDA is not required to respond to HDI's petition at or before the time the agency approves an application for a generic competitor for Derma-Smoothe and should not be ordered to do so, FDA wishes to inform the Court that it is actively considering HDI's citizen petition. *See* Declaration of Jane A. Axelrad ¶ 12 (attached hereto as Ex. 1). It has been, and remains, FDA's intention that *if* the agency were to approve an ANDA referencing

Derma-Smoothe,[2] the agency would grant or deny HDI's petition prior to taking such action, or at the latest, at the same time as issuing such approval.  *Id.*

## STATUTORY AND REGULATORY FRAMEWORK

### I.    Citizen Petitions

FDA has, by regulation, established a procedure for persons to petition the agency to issue, amend, or revoke a regulation, or to take or refrain from taking any other form of administrative action.  *See* 21 C.F.R. §§ 10.25, 10.30.  In ruling on a citizen petition, the agency takes into account, among other things, its available resources and "the priority assigned to the petition considering both the category of subject matter involved and the overall work of the agency . . . ."  21 C.F.R. § 10.30(e)(1).  The regulation requires the agency to "furnish a response to each petitioner within 180 days of" receiving the petition.  That response must approve the petition, deny it, or "[p]rovide a tentative response, indicating why the agency has been unable to reach a decision on the petition, e.g., because of the existence of other agency priorities, or a need for additional information."  21 C.F.R. § 10.30(e)(2).

---

[2]As required by its regulations and consistent with long-standing policy, FDA will not confirm or deny whether an application to market a generic version of Derma-Smoothe has been submitted to the agency.  Unless the existence of an abbreviated new drug application ("ANDA") has been previously publicly disclosed or acknowledged, FDA will not publicly disclose the existence of an ANDA before an approvable letter is sent to the ANDA applicant pursuant to 21 C.F.R. § 314.110.  21 C.F.R. § 314.430(b).  Any reference in this brief to an ANDA for a generic version of Derma-Smoothe is intended to be hypothetical in nature and should not be construed as confirmation that an ANDA is, in fact, pending.

II.    **New Drug Applications and Abbreviated New Drug Applications**

Under the FDCA, a pharmaceutical company seeking to market a "pioneer" or "innovator" drug must first obtain FDA approval by filing a new drug application ("NDA") containing extensive scientific data demonstrating the safety and effectiveness of the drug. 21 U.S.C. § 355(a), (b).  Congress amended the FDCA through the Drug Price Competition and Patent Term Restoration Act of 1984 (known as the "Hatch-Waxman Amendments"), codified at 21 U.S.C. §§ 355 and 35 U.S.C. §§ 156, 271, 282, in an effort to increase the availability of lower cost "generic" versions of approved drug products while at the same time encouraging development of new drugs.  *See* H.R. Rep. No. 98-857 (Part I), 98th Cong., 2d Sess. at 14-15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647-48; *see, e.g.*, *Tri-Bio Labs., Inc. v. United States*, 836 F.2d 135, 139 (3d Cir. 1987).  The Hatch-Waxman Amendments created Section 505(j) of the FDCA, 21 U.S.C. § 355(j), which permits a manufacturer of a generic drug to seek marketing approval through an abbreviated new drug application ("ANDA").

An ANDA applicant need not submit clinical data to demonstrate the safety and efficacy of its product, as is required for an NDA.  Rather, an ANDA relies on FDA's previous findings that the product approved under the NDA (called the "reference listed drug" or "listed drug") is safe and effective.  The FDCA sets forth in detail the information an ANDA must contain.  *See* 21 U.S.C. § 355(j)(2)(A).  Among other things, an ANDA must include information showing that the generic drug has the same active ingredient, dosage form, strength, route of administration, and labeling as the listed drug.  21 U.S.C. § 355(j)(2)(A), (j)(4); 21 C.F.R. §§ 314.127(a), 314.94(a).  In addition, an ANDA must show that "the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug are []adequate to assure

5

and preserve its identity, strength, quality, and purity." 21 U.S.C. § 355(j)(4)(A); 21 C.F.R.

§§ 314.127(a)(1), 314.94(a)(9).  Moreover, and most importantly in this case, an ANDA must

include information showing that the generic drug product is "bioequivalent" to the reference

listed drug product.  21 U.S.C. § 355(j)(2)(A)(iv), (j)(4)(F); 21 C.F.R. §§ 314.127(a)(6)(i),

314.94(a)(7).

　　　　Generally speaking, a drug is considered to be bioequivalent to the reference listed drug if

"the rate and extent of absorption of the drug do not show a significant difference from the rate

and extent of absorption of the listed drug when administered at the same molar dose of the

therapeutic ingredient . . . ." 21 U.S.C. § 355(j)(8)(B)(i); *see* 21 C.F.R. § 320.1(e); *see also*

21 C.F.R. § 320.23(b).  For drugs like fluocinolone acetonide topical oil that are not intended to

be absorbed into the bloodstream, Congress authorized FDA to "establish alternative,

scientifically valid methods to show bioequivalence if the alternative methods are expected to

detect a significant difference between the drug and the listed drug in safety and therapeutic

effect." 21 U.S.C. § 355(j)(8)(C).  Bioavailability for such drugs "may be assessed by

measurements intended to reflect the rate and extent to which the active ingredient or active

moiety becomes available at the site of action." 21 C.F.R. § 320.23(a)(1).  The "bioequivalence

requirement 'acts as a market entry restriction to ensure that generic drugs will be as safe and

effective as their pioneer drug counterparts.'" *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp.

212, 216 (D.D.C. 1996) (quoting *Schering Corp. v. FDA*, 51 F.3d 390, 396 (3d Cir. 1995)).

　　　　If an ANDA fails to satisfy any of the requirements in 21 U.S.C. § 355(j)(2), it will not be

approved.  *See* 21 U.S.C. § 355(j)(4).

## FACTUAL BACKGROUND

HDI manufactures and distributes Derma-Smoothe/FS (fluocinolone acetonide topical oil, 0.01%), NDA 19-452, which is approved in adult patients for the treatment of atopic dermatitis and scalp psoriasis, and in patients two years of age and older, for the treatment of moderate to severe atopic dermatitis. *See* Compl. ¶¶ 9-10; Compl. Ex. B. at 2. HDI submitted a citizen petition to FDA on September 30, 2004, which FDA received on October 1, 2004. *See* Compl. Ex. B; Letter from FDA to HDI dated Oct. 4, 2004 (attached hereto as Ex. 2). In the petition, HDI requested, among other things, that FDA require any actual or potential ANDA applicants for fluocinolone acetonide topical oil to demonstrate bioequivalence only through "conducting studies with clinical endpoints, the same as those established by" HDI, rather than through use of a "vasoconstriction assay (skin blanching test) . . . . " Compl. Ex. B at 1; *see also* Compl. ¶ 20. HDI also asserted that its product contains a proprietary peanut oil and that ANDA applicants for generic versions of Derma-Smoothe "using another non-proprietary source of peanut oil" must "demonstrate that their product meets strict specifications to ensure that peanut protein is not present in the product (or present in quantities that do not raise safety concerns)." Compl. Ex. B at 3; *see also* Compl. ¶ 21. HDI states that it "filed its Citizen Petition to make FDA aware" of the allegedly "unique challenges" presented by Derma-Smoothe's topical peanut oil formulation and "to raise HDI's concerns *well in advance* of any [ANDAs] being submitted to FDA." *Id.* ¶ 13 (emphasis added).

On March 24, 2005, one hundred seventy five days after receiving the petition, FDA sent a "tentative response" letter to HDI, pursuant to 21 C.F.R. § 10.30(e)(2). *See* Compl. Ex. C. FDA explained that it had been unable to reach a decision on the petition because of the "need to

address other Agency priorities." *Id.* The letter stated that the agency would respond to the petition "as soon as possible given the numerous demands on the Agency's resources." *Id.*

On December 13, 2005, HDI submitted an amendment to its citizen petition docket to "emphasize some issues that . . . are critical to establishing pharmaceutical and bioequivalence with respect to a generic equivalent version of [HDI's] proprietary drug product, Derma-Smoothe/FS . . . ." Letter from HDI to FDA dated Dec. 13, 2005 at 2-3 (attached hereto as Ex. 3); *see also* Compl. ¶ 14. On August 22, 2006, HDI again supplemented its petition with the submission of a testimonial from Howard I. Maibach, M.D., excerpts from advisory committee meeting transcripts, and other information. *See* Letter from HDI to FDA dated Aug. 22, 2006 (cover letter attached as Ex. 4). On March 1, 2007, fifteen days before filing its Complaint, HDI further amended its petition to add the affidavits of Ralph Harkins, Ph.D. and Dr. Maibach. Compl. Ex. D. On March 16, 2007, HDI sent a letter to the petition docket seeking to incorporate by reference its entire NDA application into the docket. *See* Letter from HDI to FDA dated March 16, 2007 (attached hereto as Ex. 5).

FDA is actively considering the scientific arguments and supporting information set out in HDI's petition, but has not yet issued a response. Axelrad Decl. ¶ 12.

## ARGUMENT

As HDI acknowledges, the stay it seeks is "extraordinary relief." Pl.'s Mem. at 2. A motion to stay is judged by the same standard as a motion for preliminary injunction. *SEC v. Lines Overseas Mgmt, Ltd.,* Civ No. 04-302, 2006 U.S. Dist. LEXIS 6234 *4-5 (D.D.C. Feb. 1, 2006); *see, e.g.*, *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958); Pl.'s Mem. at 3 n.2. To obtain a stay, a party must demonstrate that: (1) it has

a substantial likelihood of success on the merits; (2) it will suffer irreparable injury in the absence of the stay; (3) other interested parties will not be substantially injured if the requested relief is granted; and (4) granting such relief would serve the public interest. *See Virginia Petroleum*, 259 F.2d at 925; *see also Fund for Animals v. Norton*, 294 F. Supp. 2d 92, 113-14 (D.D.C. 2003).

This Court must balance the four factors in deciding whether to grant the motion to stay. *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). A showing of substantial likelihood of success on the merits is "particularly important" and absent such a showing "'there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review.'" *Biovail Corp. v. FDA*, 448 F. Supp. 2d 154, 159 (D.D.C. 2006) (quoting *Am. Bankers Ass'n v. Nat'l Credit Union Admin*. 38 F. Supp. 2d 114, 140 (D.D.C. 1999)); *Virginia Petroleum*, 259 F.2d at 925. Moreover, even where a movant demonstrates a substantial likelihood of success on the merits, if it makes no showing of irreparable injury, its motion may be denied on that basis alone. *See CityFed*, 58 F.3d at 747.

## I.    HDI Is Not Likely To Succeed On The Merits

HDI contends that FDA's failure to either approve or deny its citizen petition constitutes agency action that is unlawfully withheld or unreasonably delayed, in violation of the APA, 5 U.S.C. §§ 555(b), 706(1).[3]  *See* Pl.'s Mem. at 4.   In particular, HDI argues that the agency's March 24, 2005 tentative response letter does not comply with the agency's obligation under 21 C.F.R. § 10.30(e)(2)(iii) "because of the excessive and unreasonable length of time that has

---

[3]In its Complaint, HDI asserts, without elaboration, that its right to due process also has been violated.  Compl. ¶ 1 & p.11.  HDI's memorandum in support of its motion to stay does not mention its due process claim, and thus the government does not address it here.

elapsed" since the citizen petition was submitted.  Compl. ¶ 17; *see id.* ¶ 29 ("The March 24, 2005, letter amounts to no response at all, and is an unsupportable conclusory statement not in compliance with 21 C.F.R. § 10.30(e)(2)."); *see also* Pl.'s Mem. at 9.

        An agency is accorded great deference in interpreting its own regulations,[4] and FDA's reading of the regulation at issue is eminently reasonable.  The regulation neither requires FDA to approve or deny a citizen petition in a particular time, nor compels FDA to offer an elaborate explanation when it provides a tentative response stating that the agency will not be able to decide the petition within 180 days.  Specifically, the citizen petition regulation requires FDA to "furnish a response to each petitioner within 180 days of" receiving the petition that either approves the petition, denies it, or "[p]rovides a tentative response, indicating why the agency has been unable to reach a decision on the petition . . . ." 21 C.F.R. § 10.30(e)(2).  FDA received HDI's petition on October 1, 2004, *see* Ex. 2, and issued its tentative response letter on March 24, 2005, Compl. Ex. C., within the 180 time frame specified in the regulation.  The tentative response letter also stated why the agency had not reached a decision on the petition:  "FDA has been unable to reach a decision on your petition because of the need to address other Agency priorities," and it stated that the agency would respond to the petition "as soon as possible given the numerous demands on the Agency's resources."  Compl. Ex. C.  FDA's letter thus complied fully with the plain language of the regulation.  Because FDA fully satisfied the requirements

---

[4]*Mistick PBT v. Chao*, 440 F.3d 503, 513 (D.C. Cir. 2006) ("This Court affords great deference to an agency's interpretation of its own regulation: . . . we can reject the [agency's] interpretation only if it is plainly erroneous or inconsistent with the regulation.") (internal citations and quotations omitted); *see Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *United States Air Tour Ass'n v. FAA*, 298 F.3d 997, 1005 (D.C. Cir. 2002); *Wyoming Outdoor Council v. U.S. Forest Serv.,* 165 F.3d 43, 52 (D.C. Cir. 1999).

imposed by regulation for responding to citizen petitions, HDI's contention that FDA's tentative

letter did not comply with 21 C.F.R. § 10.30(e)(2) is simply incorrect.

Absent from HDI's motion is a discussion of *Biovail Corp. v. FDA*, 448 F. Supp. 2d 154

(D.D.C. 2006), which rejected the very argument that HDI advances here.  In that case, Biovail,

also a pioneer drug manufacturer, filed a citizen petition seeking "to ensure that [FDA] applies

the proper standards in determining whether the generic drugs pending FDA approval are the

bioequivalents of Wellbutrin XL," and sought emergency injunctive relief after FDA "fail[ed] to

respond substantively to [its] citizen petition within 180 days."  *Id.* at 157.  The court held that

the tentative response letter FDA issued to Biovail complied with the terms of the regulation and

thus Biovail was "not likely to succeed on its claim that [FDA] violated its rights by not

responding in 180 days." *Id.* at 162.  The court also declined to find fault with FDA's alleged

"practice of deciding citizen petitions simultaneously with ANDAs." *Id.*  The court reasoned,

"absent legal authority requiring [FDA] to rule on [a] citizen petition prior to ruling on an

ANDA, [Biovail's] allegations are insufficient to demonstrate a substantial likelihood of success

on the merits." *Id.*

HDI similarly fails to show that it is likely to succeed on its claim that FDA's delay in

answering the citizen petition is contrary to the APA's requirement that agencies decide matters

"within a reasonable time."  *See* Pl.'s Mem at 4; 5 U.S.C. § 555(b).  Under the APA, 5 U.S.C.

§ 706(1), a court can compel an agency to take an action that has been unreasonably delayed, but

"a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a

*discrete* agency action that it is *required to take*." *Norton v. Southern Utah Wilderness Alliance*,

542 U.S. 55, 64 (2004) (emphasis in original).  "Resolution of a claim of unreasonable delay is

11

ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003).

In evaluating a claim of unreasonable delay, the Court considers four factors: (1) the "courts should ascertain the length of time that has elapsed since the agency came under a duty to act"; (2) the "reasonableness of the delay must be judged in the context of the statute which authorizes the agency's action"; (3) the "court must examine the consequences of the agency's delay"; and (4) "the court should give due consideration in the balance to any plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources." *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992) (internal quotations and citations omitted); *see also Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001). Even where unreasonable delay is found, judicial intervention is warranted only in exceptional cases. *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) (describing the cases where the court has "issued an order compelling an agency to press forward with a specific project" as "exceptionally rare"); *Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1, 12 (D.D.C. 2003) ("The issuance of equitable relief under section 706 of the APA 'is an extraordinary remedy and [the Court] require[s] similarly extraordinary circumstances to be present before [it] will interfere with an ongoing agency process.'") (quoting *Cmty. Nutrition Inst. v. Young*, 773 F.2d 1356, 1361 (D.C. Cir. 1985)). Considering these factors, particularly the absence of consequences of the delay to HDI and FDA's explanation for the delay (*see* Axelrad Decl.), the agency's delay in responding to HDI's

citizen petition has not been unreasonable, much less so "egregious" as to warrant any action by this Court.

With respect to the length of the delay, HDI trumpets that more than 900 days have passed since its citizen petition was first submitted and claims that a "delay spanning more than five (5) times than the *required response time*" of 180 days for responding to petitions "amounts to a refusal to act . . . ." Pl.'s Mem. at 4-5 (emphasis added). Both of the factual predicates of this claim are flawed. As an initial matter, HDI's petition as amended has not been pending 900 days: HDI amended or supplemented it in December 2005, August 2006, and twice in March 2007. Likewise, as discussed above, HDI's characterization of the 180 day time frame as a "required [complete] response time" overlooks critical language in the regulation. When FDA issued its timely tentative response letter to HDI, the agency took the only action it was required to take within the 180 day time frame. *See* 21 C.F.R. § 10.30(e)(2); *Biovail*, 448 F. Supp. 2d at 162 ("[FDA] issued a tentative response within 180 days and explained the reason it could not reach a decision within that time frame. Accordingly, [FDA] complied with the terms of the regulation . . . .") (internal citation omitted).[5]

The second factor to be considered is the reasonableness of the delay in the context of the statute. *Int'l Chem.,* 958 F.2d at 1149. Courts "look to see whether Congress has imposed any applicable deadlines or otherwise exhorted swift deliberation concerning the matter before [the court] or whether the statutory scheme implicitly contemplates timely final action . . . ." *Sierra*

---

[5]In all events, although HDI characterizes the delay here as "manifestly unreasonable," Pl.'s Mem. at 4, whether a delay is unreasonable "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful . . . ." *Mashpee*, 336 F.3d at 1102; *see also Int'l Chem.*, 958 F.2d at 1149 ("there is no *per se* rule as to how long is too long . . . .").

*Club. v. Thomas*, 828 F.2d 783, 797 (D.C. Cir. 1987).  In the FDCA, Congress delegated to FDA

the authority to determine the safety and effectiveness of generic drug products prior to

marketing, and, as discussed above, there are numerous complex scientific statutory and

regulatory requirements that ANDA applicants must satisfy prior to approval.  None of those

statutory or regulatory requirements mandate that FDA respond to a competitor's citizen petition

before approving a product.  *See* 21 U.S.C. § 355(j); *see generally* 21 U.S.C. §§ 301-97; *Biovail*,

448 F. Supp. 2d at 162.[6]  Moreover, under the statute, the agency must approve an application

unless certain findings set out in the FDCA are identified.  *See* 21 U.S.C. § 355(j)(4).  Because

the FDCA does not require that FDA issue a response to a citizen petition prior to approving a

related application, let alone establish a statutory timetable for issuing such a response, the

agency "is entitled to considerable deference in how expeditiously it proceeds with agency

action."  *See Beyond Pesticides/Nat'l Coalition Against the Misuse of Pesticides v. Johnson*,

407 F. Supp. 2d 38, 40 (D.D.C. 2005).

The third factor, which focuses on the "consequences of the agency's delay," also

counsels strongly against a finding of unreasonable delay here.  HDI's petition has no effect on

*HDI's ability* to market Derma-Smoothe.  HDI was marketing the drug under its NDA before the

petition was submitted and has continued to do so.  The petition relates to what criteria *ANDA*

---

[6]The delay at issue is likewise reasonable in the context of FDA's citizen petition regulation,
21 C.F.R. § 10.30.  Section 10.30(e) expressly contemplates that the agency will be unable to
approve or deny all petitions within 180 days and that the agency will prioritize its responses
based on its resources.  *See* 21 C.F.R. 10.30(e)(1) ("The Commissioner shall, in accordance with
paragraph (e)(2), rule upon each petition filed under paragraph (c) of this section, *taking into
consideration* (i) *available agency resources* for the category of subject matter, (ii) the *priority
assigned to the petition considering both the category of subject matter involved and the overall
work of the agency*, and (iii) time requirements established by statute.") (emphasis added).

*applicants* must satisfy in order to market generic competitors to Derma-Smoothe, not to

standards that apply to HDI.  HDI claims that "FDA's delay in acting on HDI's Citizen Petition

undeniably implicates public health and safety concerns."  Pl.'s Mem. at 5.  Yet, the "public

safety" issues hypothesized by HDI do not result from the length of time the petition has been

pending before the agency.[7]  FDA has not approved any ANDAs for generic Derma-Smoothe

products, and thus HDI cannot claim that it or any member of the public is currently being

harmed by the sale of bio*in*equivalent generic Derma-Smoothe products.[8]  Moreover, HDI's

entire safety argument is premised on the theory that FDA will not properly evaluate any ANDA

that comes before it.  This speculative argument flies in the face not only of the legal

---

[7]HDI notes that courts have found delays "less tolerable when human health and welfare are at stake."  Pl.'s Mem. at 5.  *See Int'l Chem.*, 958 F.2d at 1149; *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984).  However, the D.C. Circuit has deemed this consideration "hardly . . . dispositive" where, as here, "virtually the entire docket of an agency involves issues of this type."  *See Sierra Club*, 828 F.2d at 798; *see also Beyond Pesticides*, 407 F. Supp. 2d at 40.  In any event, the "delay" here poses no threat to health and welfare because FDA has not approved an ANDA for generic Derma-Smoothe.

[8]This case thus stands in sharp contrast to other cases where agencies have been found to have delayed unreasonably.  *See, e.g., Cobell*, 240 F.3d at 1097 ("Documents necessary for a proper accounting and reconciliation have been lost or destroyed . . . . The longer defendants delay in creating the plans necessary to render an accounting, the greater the chance that plaintiffs will never receive an actual accounting of their own trust money. Given that many plaintiffs rely upon their IIM trust accounts for their financial well-being, the injury from delay could cause irreparable harm to plaintiffs' interests in IIM trust beneficiaries . . . [which include] not merely economic interests . . , but personal interests in life and health.");  *Int'l Chem.*, 958 F.2d at 1150 (rulemaking took six years, "an extraordinarily long time, in light of the admittedly serious health risks [to workers] associated with the current permissible levels of cadmium exposure under the twenty-year-old standards still in place.");  *Sandoz, Inc. v. Leavitt*, 427 F. Supp. 2d 29 (D.D.C. 2006) (where NDA applicant could not market its drug until FDA approved its application and statute required the agency to act on such applications within 180 days of filing, "nearly 1000-day response time was unreasonable ");  *Fund for Animals,* 294 F.Supp. 2d at 113-14 (five year delay in responding to petition for rulemaking to prohibit snowmobiling in national parks was unreasonable where ongoing use of snowmobiles in the parks during the period of delay was impairing park air quality and wildlife).

presumption that the government will perform its tasks properly,[9] but also of FDA's well-established track record in challenges to its bioequivalence determinations.[10]

Finally, courts "give due consideration in the balance to any plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources." *Int'l Chem.,* 958 F.2d at 1149.[11]  As explained in FDA's March 2005 tentative response letter, there are numerous demands on the agency's resources, and FDA has not reached a decision on HDI's petition because the agency has had to focus on other priorities.  Compl. Ex. C.  Responding to a petition like the one at issue here is a significant undertaking, typically involving review and input from multiple offices within the agency, including scientific staff from the Center for Drug Evaluation and Research ("CDER").

---

[9] *See, e.g.*, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1091 (D.C. Cir. 1992); *Biovail*, 448 F. Supp. 2d at 161.

[10] *See, e.g.*, *Biovail Corp. v. FDA*, Civ. No. 06-1487, 2007 U.S. Dist. LEXIS 20238 (D.D.C. Mar. 22, 2007) (denying motion for temporary restraining order, the court explained that FDA's determination that the ANDA warranted approval "rests squarely on the FDA's evaluation of scientific data within its area of expertise [and it is] entitled to a high level of deference from this court") (internal citations and quotations omitted); *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. at 216-18 (Bristol-Myers sought a preliminary injunction against FDA's approval of a generic competitor, arguing that FDA had impermissibly utilized *in vitro* testing to determine the bioequivalence of the generic product; the court denied the preliminary injunction, explaining that the "case involves the agency's scientific judgments concerning what testing methods are needed to establish bioequivalence," and that FDA "has wide discretion to determine how the bioequivalence requirement is met . . . ."); *Somerset Pharms., Inc. v. Shalala*, 973 F. Supp. 443, 453 (D. Del. 1997) (the court rejected Somerset's motion for a preliminary injunction, because "determination of *which* method is the most 'accurate, sensitive, and reproducible' for measuring bioequivalence is a matter of scientific judgment, falling squarely with the FDA's discretion.") (emphasis in original).

[11] Although a "court need not 'find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed,'" *TRAC*, 750 F.2d at 80, it is noteworthy that HDI does not allege that the delay at issue here is the result of bad faith on the part of FDA.

16

Axelrad Decl. ¶ 7.  CDER's scientific staff is also charged with reviewing NDAs and ANDAs, and there are statutory and other time frames applicable to FDA's review of those applications. *Id.* ¶ 9; *see also id.* ¶ 8.  As a result of the numerous petitions the agency receives, FDA must prioritize its workload.  *Id.* ¶ 12; *see, e.g.*, *Sierra Club*, 828 F.2d at 798 ("Given that Congress provides EPA with finite resources to satisfy [its] various responsibilities, the agency cannot avoid setting priorities among them.").  FDA is, in fact, currently in the process of considering HDI's petition.  Axelrad Decl. ¶ 12.  Moreover, although it is not required to do so, *if* the agency were to approve an ANDA referencing Derma-Smoothe, FDA intends to grant or deny HDI's petition prior to taking such action, or at the latest, at the same time as issuing such approval.  *Id.*

Courts are appropriately reluctant to interfere with the kind of priority setting at issue here, recognizing that "agency is in a unique – and authoritative – position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way."  *Barr Labs.*, 930 F.2d at 76; *see also Cobell*, 240 F.3d at 1096 ("For good reason, courts are reluctant to upset existing agency priorities, unless the delay is 'egregious.'"); *Sierra Club*, 828 F.2d at 797 ("we are properly hesitant to upset an agency's priorities by ordering it to expedite one specific action, and thus give it precedence over others."); *Public Citizen Health Research Group v. Brock*, 823 F.2d 626, 629 (D.C. Cir. 1987) (courts "should intervene to *override* agency priorities and timetables only in the most egregious cases.") (emphasis in original).

Taking all of these factors into consideration, HDI has failed to establish that the delay at issue here is not reasonable, much less egregious, or that judicial intervention is warranted. Because HDI has not shown the requisite likelihood of success on the merits, its motion to stay should be denied.

II.    **HDI Has Not Shown That It Will Suffer**
       **Irreparable Harm Without Injunctive Relief**

HDI also has failed to demonstrate that it will suffer irreparable harm absent an order

staying approval of ANDAs referencing HDI's Derma-Smoothe.  Courts insist that only

*irreparable* harm justifies the issuance of the kind of equitable relief that HDI seeks.  *Experience*

*Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003).  Because HDI's "likelihood of

success is slim," HDI "would have to make a very substantial showing of severe irreparable

injury" to prevail on its motion.  *See Nat'l Pharm. Alliance v. Henney,* 47 F. Supp. 2d 37, 41

(D.D.C. 1999); *see also Apotex, Inc. v. FDA*, 2006 U.S. Dist. LEXIS 20894 *54 (D.D.C. Apr. 19,

2006).  "Irreparabilty of injury is a very high standard."  *See Bristol-Myers,* 923 F. Supp at 220.

The movant must show that the "harm he faces is imminent and certain, rather than remote and

speculative." *Trudeau v. FTC*, 384 F. Supp. 2d 281, 297 (D.D.C. 2005); *see Wisconsin Gas Co.*

*v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (injury alleged must be certain, great, actual, and

imminent).  The injury also must be "serious in terms of its effect on the plaintiff." *Gulf Oil*

*Corp. v. Dep 't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981).

Although a showing of irreparable harm is the *sine qua non* of the extraordinary relief

HDI seeks, *Experience Works,* 267 F. Supp. 2d at 96, HDI offers only a terse, unsupported, and

wildly speculative assertion of irreparable harm: "as a result of the FDA's unreasonable delays,

HDI risks irreparable damage to its business reputation and good will if the FDA approves an

ANDA referencing HDI's products without requiring the basic safeguards requested by HDI in its

Citizen Petition."  Pl.'s Mem. at 7.  HDI apparently contends that if FDA is not required to

answer HDI's petition before approving any ANDAs for Derma-Smoothe that (1) FDA may

18

disregard the requirements of the FDCA and its own regulations and approve a generic drug that

is not, in fact, bioequivalent to Derma-Smooth; (2) that generic drug will cause "potential injury

to the public health and safety"; and (3) the injury caused by the generic drug will harm *HDI's*

reputation and good will. This is pure conjecture by HDI – and, tellingly, HDI's claim is not

supported by affidavit or other evidence. FDA does not approve products for marketing until

those products have satisfied the applicable statutory and regulatory requirements, and, as noted

above, FDA's decisions on drug approvals are entitled to a presumption of regularity.

Similarly speculative claims of harm to reputation and good will have been found

insufficient to establish irreparable harm. In *Biovail*, for example, the plaintiff pioneer drug

manufacturer argued that it would "suffer 'inevitable and irreparable harm' if a generic form of

Wellbutrin XL has a higher risk than the original of serious side effects." 448 F. Supp. 2d at 164.

In rejecting that argument, the court explained:

> Never does the plaintiff allege that the generic drug awaiting FDA approval
> contains harmful variations of bupropion; it merely states that *if* the generic
> version is harmful and *if* the FDA applies improper procedures and approves it,
> and *if* the generic drug causes seizures, then it will affect Wellbutrin XL's
> reputation. These allegations of the potential injury to the plaintiff's reputation are
> insufficient to justify the extraordinary relief of a TRO.

*Id.* at 165 (emphasis added)*; accord Biovail Corp. v. FDA*, Civ. No. 06-1487, 2007 U.S. Dist.

LEXIS 20238, *24-26 (D.D.C. Mar. 22, 2007). Similarly, in *Bristol-Myers Squibb Co. v.*

*Shalala*, 923 F. Supp. 212, 220 (D.D.C. 1996), the court held that irreparable harm was not

shown by a pioneer drug manufacturer's claim "based solely upon conjecture" that its reputation

would be harmed if a health risk ensued from approval of a generic that "might be imputed to

[the plaintiff] by the using public." *See Somerset Pharms., Inc. v. Shalala*, 973 F. Supp. 443,

19

454-55 (D. Del. 1997) (irreparable harm not established by plaintiff's bare assertion that it would suffer harm to its "reputation if patients are injured by bioinequivalent generics which are mistaken for [plaintiff's drug]."); *see also Trudeau*, 384 F. Supp. 2d at 297 ("[A]s with all other forms of irreparable harm, the showing of reputational harm must be concrete and corroborated, not merely speculative.").

Moreover, if FDA were to approve an ANDA referencing Derma-Smoothe and HDI should then believe that approval to have been improper, HDI could challenge the approval in court and seek emergency injunctive relief. *See Biovail*, 448 F. Supp. 2d at 164-66; *see also* note 10 *supra* (citing cases where innovator drug manufacturers have challenged ANDA approvals and sought temporary restraining orders and/or preliminary injunctions). Even assuming that it would take a week or two for HDI to obtain a ruling on a motion for such relief, HDI has not even alleged that the economic loss it may suffer in that period rises to the level of irreparable harm. Nor could it. In this Circuit, even irrecoverable economic loss does not rise to the level of irreparable harm unless the financial injury threatens the destruction of the movant's business. *see United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 988, 991 (D.D.C. 2006) ("the complete destruction of their business" is "the legal standard applied by [the D.C. Circuit] in determining whether economic loss constitutes irreparable harm."); *Apotex, Inc. v. FDA*, 2006 U.S. Dist. LEXIS 20894 *54; *Experience Works, Inc.*, 267 F. Supp. 2d at 96 ($21.1 million reduction in funding is serious financial blow, but one frequently faced by other similar entities, and not an economic loss that threatens survival of the business); *Sociedad Anonima Viña Santa Rita v. Dep't of Treasury*, 193 F. Supp. 2d 6, 14 (D.D.C. 2001) ("financial harm alone cannot constitute irreparable injury unless it threatens the very existence of the movant's business");

*Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 42-43 (D.D. C. 2000).

Because HDI has not demonstrated any concrete and corroborated irreparable injury, its motion to stay should be denied.

## III.    The Requested Relief Would Not Serve The Public Interest

HDI has also failed to show that any potential harm to its interests in the absence of a stay outweighs the potential harm to third parties, or that the entry of such relief would further the public interest – the third and fourth factors in the standard for its motion to stay.  HDI acknowledges that the relief it seeks may cause "generic ANDA applicants [to] suffer a minor delay" if any such ANDAs have been filed, but claims that that harm is outweighed by the "potential injury to the public health and safety and to HDI's reputation and good will that would result from the approval of ANDAs without the necessary and proper safeguards."  Pl.'s Mem. at 7-8.  HDI cites the same risk to the public health in support of its assertion that issuance of a stay would serve the public interest.  *See id.* at 8.  However, as discussed above, the injuries and safety risks HDI cites are purely conjectural.  *See Biovail*, 448 F. Supp. 2d at 166 ("Because the plaintiff has not established, or even alleged, that the pending ANDA represents a drug that is unsafe, the court concludes that the public interest is best served by denying the plaintiff's motion.").

HDI also claims that the public interest would be served by a stay because it would promote judicial economy and efficiency.  *See* Pl.'s Mem. at 8-9.  We disagree.  First, HDI's present action, brought even though the firm is suffering *no* present harm and its claimed future harm is based on the improbable assertion that FDA will approve a generic version of Derma-Smoothe that does not meet the FDCA's standard for approval, is hardly a model of judicial

economy. HDI could have waited to see whether FDA granted or denied its petition, and *if* FDA denied the petition and *if*, in HDI's view, FDA "improperly" approved a generic competitor to Derma-Smoothe, then HDI could have initiated suit at that time.

Second, the precedent HDI asks this Court to set is contrary to the public's interest in receiving "generic competition to brand-name drugs as soon as possible." *See Boehringer Ingelheim Corp. v. Shalala,* 993 F. Supp. 1, 3 (D.D.C. 1997); *Biovail*, 448 F. Supp. 2d at 166; *see also Barr Labs.*, 930 F.2d at 76 ("Congress sought to get generic drugs into the hands of patients at reasonable prices – fast."). There is no requirement that FDA respond to a citizen petition before taking action on a related ANDA. Indeed, FDA has observed that where a petition challenges certain aspects of an application, it is frequently helpful, and efficient, to consider the issues raised in a citizen petition at the same time the agency reviews the application. *See* Axelrad Decl. ¶ 11. In any event, before approving an ANDA, FDA reviews and resolves any scientific issues that bear on safety and/or effectiveness of the ANDA, including any such issues presented in pending citizen petitions. However, FDA may, at its option, reflect its resolution of those issues in other agency records (e.g., the ANDA file) rather than issuing the petition response at the time the agency acts on the ANDA. *Id.* ¶ 3. If this Court compels FDA to respond to HDI's citizen petition before it may approve any related ANDA, other innovator drug manufacturers will likely follow HDI's example and file petitions and suits just like this one. The reorienting of FDA's priorities and schedule as a result of judicial intervention and the delays in the approval of generic drugs would be contrary to the public interest and judicial economy.

## CONCLUSION

For the foregoing reasons, HDI's motion to stay should be denied.

Respectfully submitted,

PETER D. KEISLER
Of Counsel:                                    Assistant Attorney General

DANIEL MERON                                   C. FREDERICK BECKNER III
General Counsel                                Deputy Assistant Attorney General

SHELDON T. BRADSHAW                            EUGENE M. THIROLF
Associate General Counsel                      Director
Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation              /s/ _____
                                               GERALD C. KELL (D.C. Bar No. 929125)
PAIGE H. TAYLOR                                Senior Trial Counsel
Associate Chief Counsel, Litigation            Office of Consumer Litigation
U.S. Dept. of Health & Human Services          U.S. Department of Justice
Office of the General Counsel                  P.O. Box 386
5600 Fishers Lane                              Washington, D.C. 20044
Rockville, MD  20857                           Tel:  202-514-1586
301-827-1161                                   Fax:  202-514-8742
                                               gerald.kell@usdoj.gov

May 4, 2007

23

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HILL DERMACEUTICALS, INC.        )
                                 )
        Plaintiff,               )
                                 )
    v.                           )        Civil Action No. 07-cv-00552 (RCL)
                                 )
U.S. FOOD & DRUG                 )
ADMINISTRATION, et al.           )
                                 )
                                 )
        Defendants.              )
                                 )
_____  )

## DECLARATION OF JANE A. AXELRAD

1.      I am the Associate Director for Policy and the Director of the Office of

Regulatory Policy (ORP) in the Food and Drug Administration's (FDA's) Center for

Drug Evaluation and Research (CDER). I have served as the Associate Director for

Policy, CDER, for over 15 years. The information contained in this declaration is based

on my personal knowledge, and information made known to me in my official capacity

and about which I have become knowledgeable.

2.      FDA regulations permit any interested person to file a citizen petition

requesting FDA "to issue, amend, or revoke a regulation or order, or to take or refrain

from taking any other form of administrative action." 21 C.F.R. § 10.30. CDER is

responsible for responding to citizen petitions relating to drug products for human use.

Frequently, these petitions raise very specific and complex scientific issues concerning

the process for approving a generic drug product (i.e., a drug product that is

therapeutically equivalent or interchangeable with an innovator product) through an

abbreviated new drug application (ANDA). For example, the petitioner may propose

that a particular type of study or several studies are necessary to show that the drug described in the ANDA is "bioequivalent" to the innovator drug as the term is defined in 21 C.F.R. § 320.1. As another example, a petitioner could state that a specific polymorphic form of an active ingredient in an ANDA must be used to produce a bioequivalent product. The petitioner may also propose that the generic applicant must duplicate the innovator's manufacturing methods to achieve the same active ingredient, or may cast doubt on some other aspect of the ability of a generic applicant to have the same active ingredient as the innovator.

3.    FDA must resolve scientific issues that bear on safety and/or effectiveness of the ANDA before ANDA approval. It is rare that petitions present new issues that CDER has not considered through its own approval process, but the Agency must nevertheless assure itself of that fact by reviewing a relevant citizen petition before final ANDA approval. There is, however, no general requirement that the FDA respond to a citizen petition before taking action on a related ANDA. Accordingly, FDA may, at its option, reflect its resolution of the issues raised in a related citizen petition in other FDA records (e.g., an ANDA file) rather than issuing the petition response at the time the Agency acts on the ANDA.

4.    Within CDER, ORP has primary responsibility for drafting responses to most citizen petitions, petitions for stay of administrative action, and petitions for reconsideration (see 21 C.F.R. §§ 10.30, 10.33, 10.35). Exceptions include petitions relating to over-the-counter (OTC) drug monographs (see 21 C.F.R. § 330.10) and "suitability" petitions (see 21 U.S.C. § 355(j)(2)(C)).

2

5.      In 2006, FDA received 96 petitions (i.e., citizen petitions, petitions for stay, and petitions for reconsideration) relating to drugs for human use (excluding suitability petitions and petitions related to OTC monographs). As of March 31, 2007, 203 such petitions were pending with the Agency.

6.      A high percentage of the petitions that relate to the approvability of generic drugs are denied. An analysis of petitions answered between calendar years 2001 and 2005, raising issues about the approvability of generic products (42 total responses), showed that FDA denied 33, denied three in part, and granted six. It should be noted that when petitions are granted, wholly or in part, it is often because FDA already has the proposed scientific or legal standard in place or is already planning to take the action that the petition requests. Although the citizen petition process is a valuable mechanism for the Agency to receive information from the public, it is noteworthy that very few of these petitions on generic drug matters have presented data or analysis that significantly altered FDA's policies. Of the 42 citizen petition responses examined, only three petitions led to a change in Agency policy on the basis of data or information submitted in the petition.

7.      ORP works closely with offices throughout CDER and FDA to draft responses to the petitions. ORP consults the Office of Generic Drugs (OGD) on all of the citizen petitions relating to ANDAs. In addition, ORP consults with the appropriate medical review division within the Office of New Drugs (OND) on issues relating to the innovator product that is the basis for the ANDA. If a citizen petition raises safety issues, the Office of Surveillance and Epidemiology (OSE, formerly the Office of Drug Safety) may also be involved in reviewing the petition. In addition, ORP may consult with other offices as needed (e.g., Office of Compliance, Controlled Substance Staff, Office of

3

Pharmaceutical Science). ORP also consults with the Office of Chief Counsel for FDA (OCC), a division of the Health and Human Services Office of General Counsel, regarding petitions that raise specific legal issues (e.g., relating to patents or exclusivity), and OCC reviews virtually all citizen petition responses for legal sufficiency.

8.    In addition to responding to citizen petitions, the staff of ORP responsible for this task (approximately 20 individuals) also has a number of additional significant duties, including drafting proposed and final regulations for CDER; providing general guidance on regulatory and policy matters throughout CDER; commenting on proposed legislation; responding to requests for user fee waivers and refunds under the Prescription Drug User Fee Act (PDUFA, 21 U.S.C. §§ 379g, 379h); and processing debarments under 21 U.S.C. § 335a.

9.    Of course, all of the FDA staff with whom ORP consults also has a multitude of other responsibilities unrelated to responding to citizen petitions. For example, the scientists in OND and OGD with whom ORP consults regarding issues raised in citizen petitions are also charged with reviewing new drug applications (NDAs) and ANDAs, respectively, pursuant to statutory and other timetables.

10.    In light of the number of citizen petitions CDER receives and the Agency's limited resources, FDA cannot approve or deny all of the citizen petitions it receives within 180 days of receipt. Instead, the Agency must prioritize the petitions, taking into account such factors as the complexity of the issues raised, the nature of the regulatory action at issue, the number and type of different Agency components that need to be consulted in responding to the petition, the competing demands on the staff involved in consulting on the responses to the petitions, and the available resources.

4

Specifically, CDER gives priority to petitions raising significant safety issues, such as a request that a drug be withdrawn from the market or certain warnings be added to a drug product's labeling. In addition, CDER endeavors to respond to petitions related to an upcoming regulatory action in a timely manner to avoid unnecessary delays in taking such action. For example, when an ANDA is otherwise close to approval and there is a related citizen petition, the anticipated date of action on the ANDA will be taken into account in establishing citizen petition response priorities.

11.    Where a petition challenges certain aspects of an application, it is frequently helpful, and efficient, to consider the issues raised in a citizen petition at the same time the Agency reviews the application. For example, if the manufacturer of an innovator drug product submits a citizen petition arguing that any generic versions of its drug must have precisely the same formulation as the innovator drug product, in evaluating the merits of the petitioner's scientific arguments, it may be helpful to have considered, or be considering, the proposed formulations for products in one or more generic applications.

12.    As provided in 21 C.F.R. § 10.30(e), by letter dated March 24, 2005, FDA notified Hill Dermaceuticals, Inc. (HDI) that the Agency had not yet reached a decision on HDI's citizen petition (FDA Docket No. 2004P-0448) "because of the need to address other Agency priorities" and that the Agency "will respond to your petition as soon as possible given the numerous demands on the Agency's resources." Although FDA still has not reached a decision on HDI's petition, the Agency is actively considering the petition. ORP is consulting with staff in OGD, OND, and OCC regarding the issues raised in the petition. We cannot confirm or deny whether any ANDAs referencing

5

HDI's drug Derma-Smoothe have been submitted to FDA. See 21 C.F.R. § 314.430(b).

FDA is not required to respond to a citizen petition before taking action on a related

ANDA. Nonetheless, it has been, and remains, the Agency's intention that *if* the Agency

were to approve an ANDA referencing Derma-Smoothe, we would deny or grant HDI's

petition prior to taking such action, or at the latest, at the same time as issuing such

approval.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _May 4_, 2007

Jane A. Axelrad
Associate Director for Policy and Director
of the Office of Regulatory Policy
Center for Drug Evaluation and Research
U.S. Food and Drug Administration

# EXHIBIT 2



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
Rockville, MD 20857

October 4, 2004

Mr. Jerry S. Roth
Hill Dermaceuticals, Inc.
2650 South Mellonville Avenue
Sanford, Florida 32773-9361

Dear Mr. Roth:

Your petition requesting the Food and Drug Administration to not approve any generic equivalent version of the petitioner's proprietary drug product DERMA-SMOOTHE/FS (fluocinolone acetonide 0.01% topical oil) unless and until ANDA applicants comply with statutory requirements, was received by this office on 10/01/2004. It was assigned docket number 2004P-0448/CP 1 and it was filed 10/01/04. Please refer to this docket number in future correspondence on this subject with the Agency.

Please note that the acceptance of the petition for filing is a procedural matter in that it in no way reflects an agency decision on the substantive merits of the petition.

Sincerely,

Lyle D. Jaffe
Division of Dockets Management
Office of Management Programs

# EXHIBIT 3



# Dermaceuticals, Inc.

*Specialty Dermatologicals for Children & Adults*   1 6 4 6 5   DEC 14  A9 :38

December 13, 2005

**VIA FEDERAL EXPRESS**

Dockets Management Branch, HFA-305
Food and Drug Administration
Department and Health And Human Services
5630 Fishers Lane, Room 1061
Rockville, MD  20852

## AMENDMENT TO
## CITIZEN PETITION - 2004P-0448

Dear Sir/Madam:

On September 30, 2004, Hill Dermaceuticals, ("Hill") Sanford, Fl., submitted a Citizen Petition requesting that the Commissioner of Food and Drugs not approve any generic equivalent version of the Petitioner's proprietary drug product, DERMA-SMOOTHE/FS® Scalp Oil and Body Oil (fluocinolone acetonide 0.01% topical oil) unless and until Abbreviated New Drug Application ("ANDA") applicants comply with statutory requirements to demonstrate that any proposed generic equivalent product has the same active ingredient, labeling, and conditions of use as the reference listed drug, DERMA-SMOOTHE/FS®. The Petitioner also requested that any ANDA applicant for fluocinolone acetonide topical oil must demonstrate bioequivalence which can only be done by conducting studies with clinical endpoints, the same as those established by Petitioner.

On December 9, 2005, Hill sent a letter amending CP 2004P-0448. Hill inadvertently sent an earlier version of the amendment that was essentially a copy of a letter submitted previously to Mr. Gary Buehler, Director, Office of Generic Drugs. We are hereby amending our Citizen Petition with a revised version of the document that was submitted on December 9, 2005. We apologize for any confusion.

Sincerely yours,

Jerry Roth
President
Hill Dermaceuticals, Inc.

2004P-0448                                    AMD 1



# Dermaceuticals, Inc.

*Specialty Dermatologicals for Children & Adults*

December 13, 2005

**VIA FEDERAL EXPRESS**

Dockets Management Branch, HFA-305
Food and Drug Administration
Department of Health and Human Services
5630 Fishers Lane, Room 1061
Rockville, MD  20852

## AMENDMENT TO
## CITIZEN PETITION - 2004P-0448

On September 30, 2004, Hill Dermaceuticals, ("Hill") Sanford, Fl., submitted a Citizen Petition requesting that the Commissioner of Food and Drugs not approve any generic equivalent version of the Petitioner's proprietary drug product, DERMA-SMOOTHE/FS® Scalp Oil and Body Oil (fluocinolone acetonide 0.01% topical oil) unless and until Abbreviated New Drug Application ("ANDA") applicants comply with statutory requirements to demonstrate that any proposed generic equivalent product has the same active ingredient, labeling, and conditions of use as the reference listed drug, DERMA-SMOOTHE/FS®.  The Petitioner also requested that any ANDA applicant for fluocinolone acetonide topical oil must demonstrate bioequivalence which can only be done by conducting studies with clinical endpoints, the same as those established by Petitioner.

Division of Dockets Management
December 13, 2005
Page 2 of 6

On March 26, 2005, the agency issued an interim response to the Citizen Petition noting that the Agency was unable to reach a decision due to the need to address other Agency priorities and that the Agency will respond as soon as possible given the numerous demands on the Agency's resources.

It has come to our attention that there is now currently at least one ANDA submitted to the Office of Generic Drugs seeking acceptance for filing and approval for a generic version of Derma-Smoothe/FS Scalp Oil and Body Oil (fluocinolone acetonide 0.01% topical oil.) The Petitioner is extremely concerned that despite its good faith efforts to identify, prior to the submission of ANDAs, significant scientific concerns that must be addressed with respect to conditions that a company must meet to establish equivalency to ensure the safety of patients, FDA has provided no substantive response to the Citizen Petition. FDA has publicly stated that it views the purpose of petition process is to "encourage the adversarial vetting of really thorny issues with the potential, although not an always realized goal of resolving these issues without resorting to the courts." (Statement by Sheldon Bradshaw, Generic Pharmaceutical Associations annual policy conference September 19, 2005.) Mr. Bradshaw also raised issues with respect to the timing of the submission of such Citizen Petitions. Given such statements, the Petitioner fails to understand why the Agency has not lived up to its obligations and issued a formal, substantive response to its Citizen Petition. FDA must ensure that there is a level playing field so that all firms, large and small, innovator and generic can equally compete in the marketplace.

The Petitioner is sending this amendment to the Citizen Petition to emphasize some issues that we think are critical to establishing pharmaceutical and bioequivalence with respect to a generic equivalent version of the Petitioner's proprietary drug product, DERMA-

Division of Dockets Management
December 13, 2005
Page 3 of 6

SMOOTHE/FS® Scalp Oil and Body Oil (fluocinolone acetonide 0.01% topical oil) and that we will vigorously pursue with the Agency through the administrative and legal processes, if necessary, to ensure that the statutory requirements for approval of ANDAs are met.

First, studies with clinical endpoints are necessary to establish bioequivalence and therapeutic equivalence as opposed to the vasoconstriction assay (skin blanching test) which the Agency has used as a surrogate marker to establish the therapeutic equivalence of corticosteroid creams and ointments that contain the general indication for treating corticosteroid responsive dermatoses but is not validated as a surrogate marker for the specific approved indications of scalp psoriasis or atopic dermatitis. Vasoconstrictor assays cannot and have not been conducted on the scalp. There is no validated method for such studies. All of the vasoconstrictor assays that were performed to date were conducted on the forearms. The scalp is far more permeable than the forearm and it is inappropriate to conduct a vasocontrictor assay on the scalp. Given that the scalp is the intended treatment area for Derma-Smoothe/FS Scalp Oil, bioequivalence/therapeutic equivalence can only be established through the conduct of a study on the scalp under the prescribed conditions of use measuring the relevant clinical endpoints.

Second, any approval of any generic equivalent(s) of Petitioner's DERMA-SMOOTHE/FS® must also be preceded by evidence that the proposed equivalent has the same safety and efficacy profile under use for the specific indications of widespread scalp psoriasis and/or atopic dermatitis and not for corticosteroid responsive dermatoses. The Petitioner understands that one of the current ANDA applicant(s) may be seeking approval based on demonstrating equivalence on only one of the specified indications, i.e., atopic dermatitis and not psoriasis of the scalp. As the Agency well knows, an ANDA is required to have the same

Division of Dockets Management
December 13, 2005
Page 4 of 6

conditions of use set forth in the labeling, but can "carve out" certain labeling statements that are protected by patent or market exclusivity. There is no patent or unexpired exclusivity associated with the approved indications of atopic dermatitis and not psoriasis of the scalp, thus a generic applicant is required to have the same labeling as the reference listed drug.

Third, the Petitioner firmly believes that while a vasoconstrictor assay may be an appropriate surrogate marker for certain corticosteroid responsive dermatoses conditions, it is not a generally accepted surrogate marker for either atopic dermatitis or psoriasis of the scalp. Thus the only way to establish bioequivalence is for a generic applicant to conduct a non-inferiority comparison to Derma-Smoothe/FS® using relevant clinical endpoints to show efficacy and safety to patients with wide spread scalp psoriasis with a minimum of 4 hours occluding with a shower cap.

Fourth, the formulation of the product plays a role in delivering the product to the site of action, conditioning the skin and patient acceptance in being able to wash the oily formulation out of the hair when the dosage regimen is completed. The ratio of different oils in the formulation as well as the presence of the detergent has been shown in clinical studies to impact the safety and efficacy of the product. Since Derma-Smoothe/FS Scalp Oil is the only topical corticosteroid approved for use under occlusion (with shower caps supplied in the package) any changes in the oil composition can increase adverse events such as folliculitis when the product is used under occlusion as specified in the approved labeling. The reference listed drug formulation has been demonstrated to be safe and effective under occlusion. Given that any proposed generic product may have a different ratio of oils and other excipients, which can

Division of Dockets Management
December 13, 2005
Page 5 of 6

impact safety and efficacy, studies with appropriate clinical endpoints are necessary to establish

equivalence.

Fifth, the reference listed drug is formulated with a specially designed, proprietary refined peanut oil. The Petitioner expects the Agency to require any other company pursuing a product using another non-proprietary source of peanut oil as the vehicle to set an upper limit for the amount of peanut protein that can be present in the vehicle. Any such test used to measure peanut oil, of course, must be appropriated, validated and be capable of quantifying very low levels of peanut protein.

As the Petitioner noted in the original Petition, this issue is of particular concern if the peanut oil used in the formulation is from a foreign supplier. The Agency must require foreign suppliers of peanut oil to implement appropriate specifications and controls to ensure the safety of peanut sensitive patients who use fluocinolone acetonide topical oil. The Agency recognizes the importance of this issue that was raised as a result of a study published in the New England Journal of Medicine and the responses published to the study. (NEJM, March 13, 2003, and July 17, 2003.)

Sixth, It is important to note that Derma-Smoothe/FS® Scalp Oil and Derma-Smoothe/FS® Body Oil are not interchangeable and indication specific and there is separate labeling for each product. The Derma-Smoothe/FS® Scalp Oil is not approved for children. The Petitioner was required to conduct extensive efficacy and safety studies on patients with wide spread atopic dermatitis in peanut allergic patients testing peanut oil showing it is safe on a regular basis. Currently the Petitioner is conducting safety studies on patients 3 months to 2

Division of Dockets Management
December 13, 2005
Page 6 of 6

years of age for adrenal suppression. Derma-Smoothe/FS® is the only topical oil with 50-90% body involvement that shows no adrenal suppression. This data is on file with dermatology division and was presented at the Pediatric Advisory Committee Meeting on October 23 – 24, 2003, as well as in the fall of 2004. Since the formulation can have a significant impact on peanut sensitive individuals as well as on adrenal suppression, in order to establish equivalence, the Agency must require a manufacturer of a generic version of Derma-Smoothe/FS® to conduct these types of studies.

In summary, there are significant safety issues associated with overexposure to corticosteroids, i.e., adrenal suppression. In addition, peanut sensitive individuals who are exposed to peanut protein can experience, serious, life-threatening anaphylactic reactions. The Agency must institute such appropriate regulatory requirements to ensure that all generic products meet the standards of identity, strength, quality and purity and are therapeutically equivalent so that public confidence is maintained and the public health is protected. The Petitioner is willing and able to compete in the marketplace as long as all companies seeking approval to market a generic version of DERMA-SMOOTHE/FS® are required to meet appropriate regulatory requirements for approval.

Respectfully submitted,

Signature

Jerry S. Roth
President
Hill Dermaceuticals, Inc.
2650 South Mellonville Avenue
Sanford, FL  32773-9361
(407) 323-1887
(407) 649-9213 - fax

# EXHIBIT 4



# Hill Dermaceuticals, Inc.
Innovative Dermatologicals for Children and Adults

**VIA FEDERAL EXPRESS**

Division of Dockets Management
Food and Drug Administration
Department of Health and Human Services　　　　　　　　　August 22, 2006
5630 Fishers Lane, Room 1061
Rockville, MD 20852

**Docket No. 2004P-0448**

**Re:**　**Requirements that Must Be Met to Establish Therapeutic Equivalence of Generic Versions
Fluocinolone Acetonide 0.01% topical oil to Derma-Smoothe/FS® Scalp Oil and Body Oil**

As you know, on September 30, 2004, Hill Dermaceuticals, Inc. ("Hill") submitted a Citizen Petition requesting the Commissioner of Food and Drugs not approve any generic equivalent version of the Petitioner's, Hill, proprietary drug product, *Derma-Smoothe/FS® Scalp Oil* and *Body Oil* (fluocinolone acetonide 0.01% topical oil) unless and until Abbreviated New Drug Application ("ANDA") applicants comply with statutory requirements to demonstrate that any proposed generic equivalent product has the same active ingredient, labeling, and conditions of use as the reference listed drug, *Derma-Smoothe/FS®*. In the petition Hill also requested that any ANDA applicant for fluocinolone acetonide topical oil must demonstrate bioequivalence which can only be done by conducting studies with clinical endpoints, the same as those established by Petitioner.

On March 26, 2005, the Agency issued an interim response to the Citizen Petition noting that the Agency was unable to reach a decision due to the need to address other Agency priorities and that the Agency will respond as soon as possible given the numerous demands on the Agency's resources. As of today, the Agency has provided no substantive response to the Citizen Petition.

On behalf of Hill, Howard I. Maibach, M.D. discusses the reasons ANDA applicants for fluocinolone acetonide topical oil must demonstrate bioequivalence and comply with statutory requirements to demonstrate that any proposed generic equivalent product has the same active ingredient, labeling, and conditions of use as the reference listed drug, *Derma-Smoothe/FS®*. The testimonial of Howard I. Maibach, M.D. is located in Appendix A of this submission.

Respectfully Submitted,

Jerry S. Roth
President
Hill Dermaceuticals, Inc.

Enclosures

2004P-0448　　　　　　　　　　　　　　　　　SUP 1

Appendix

A. Dr. Howard I. Maibach Letter on Bioequivalence and Safety Issues Pertaining to Generic Versions of Derma-Smoothe/FS®

B. Excerpt from the October 29 & 30, 2003 Pediatric Advisory Subcommittee of the Anti-Infective Drugs Advisory Committee of the Food and Drug Administration to review the safety data on Topical Immunomodulators and Topical Corticosteroids.

C. Excerpt from the March 25, 2004 Joint Dermatologic and Ophthalmic Drug and Non-Prescription Drug Advisory Committee Meeting, Gaithersburg, Maryland.

D. Data presented to the Advisory Committee, in PowerPoint presentation.

E. Summary of Contact Urticaria (by Howard I. Maibach, MD)

F. References: Bibliography of Howard I. Maibach, MD

G. Amin S, Lahti A, Maibach H. Eds. Contact Urticaria Syndrome. CRC Press, New York, 1997.

# EXHIBIT 5



**Hill Dermaceuticals, Inc.**
Innovative Dermatologicals for Children and Adults

March 16, 2007

<u>**Via Federal Express**</u>

Dockets Management Branch, HFA-305
Food and Drug Administration
5630 Fishers Lane, Room 1061
Rockville, MD 20852

RE:    **Docket No. 2004P-0448**

      <u>**Supplement to Citizen Petition 2004P-0448**</u>

Dear Sir/Madam:

    By this letter Hill Dermaceuticals, Inc. ("Hill") seeks to, by reference, incorporate its New Drug Application ("NDA") # 19-452 for DERMA-SMOOTHE/FS® Scalp Oil and Body Oil (fluocinolone acetonide 0.01% topical oil) into Docket 2004P-0448. Hill is not authorizing the disclosure of any proprietary and confidential commercial information to be released to the public, but does with to incorporate by reference this information so that FDA may consider any necessary information contained in Hill's NDA in order to respond to this Citizen Petition.

Sincerely yours,

Jerry Roth
President
Hill Dermaceuticals, Inc.

*2004P-0448*                                                                                    *SUP 3*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HILL DERMACEUTICALS, INC.,    ) | |
|         ) | |
|       Plaintiff,    ) | |
|         ) | |
| v.    ) | Civil Action No. 07-cv-00552 (RCL) |
|         ) | |
| U.S. FOOD & DRUG    ) | |
| ADMINISTRATION, et al.,    ) | |
|         ) | |
|         ) | |
|       Defendants.    ) | |
|         ) | |
|         ) | |

<u>**ORDER DENYING PLAINTIFF'S MOTION TO STAY**</u>

Upon consideration of plaintiff's motion to stay, defendants' opposition thereto, and the

entire record in this case, and the court being of the opinion that plaintiff's motion is not well

founded, it is hereby ORDERED that plaintiff's motion is denied.

Done this _____ day of _____ 2007.


_____
ROYCE C. LAMBERTH
United States District Judge